**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**FORT LAUDERDALE DIVISION**

| | | |
|---|---|---|
| LAUREN O'CONNOR, | ) | CASE NO. 0:25-cv-60143-AHS |
| *Plaintiff,* | ) | |
| v. | ) | |
| | ) | |
| NEW AMERICAN FUNDING LLC, | ) | |
| *Defendant.* | ) | |
| | ) | |

<u>**DEFENDANT, NEW AMERICAN FUNDING, LLC'S MOTION TO DISMISS
PLAINTIFF'S CLASS ACTION COMPLAINT**</u>

COMES NOW, Defendant, New American Funding, LLC ("NAF" or "Defendant"), by and through its undersigned counsel, and hereby moves this Court to dismiss Plaintiff, Lauren O'Connor's ("Plaintiff") Class Action Complaint as it fails to state a valid claim for violations of the Fair Debt Collection Practices Act ("FDCPA") and the Florida Consumer Collection Practices Act ("FCCPA"), and in support thereof, NAF states as follows:

**I.     RELEVANT FACTS AND ALLEGATIONS CLASS ACTION COMPLAINT**

1.     Plaintiff filed her Class Action Complaint (the "Complaint") on January 24, 2025. *See* ECF No. 1.

2.     Plaintiff alleges violations of the FDCPA, 15 U.S.C. §1692 and FCCPA, Florida Statute §559.72(17).  *See* ECF No. 1 at ¶¶ 50-72.

3.     Plaintiff's allegations are based on one (1) e-mail correspondence allegedly received in Plaintiff's email inbox, lauren.e.oconnor9@gmail.com, on Tuesday April 2, 2024, at 4:13 AM (the "E-Mail").  *See* ECF No. 1 at ¶¶ 15, 20-21, and Ex. A thereto.

4.     The E-Mail's subject line is "Online Mortgage Statement Ready to View," and the body of the E-mail states: "Your current New American Funding Monthly Billing Statement will be

CASE NO. 0:25-cv-60143-AHS

available online at [link omitted]. View your statements by logging in and clicking on 'Account Management' and then 'Document Center.' **Payment Options** Sign up for a one-time draft or Monthly Automatic Payment at no charge at [link omitted]. Make your payment over the phone by calling 800-893-5304. Mail your check to us at: New American Funding, PO Box 650076, Dallas, TX 75265-0076. Please remember to include your 10-digit account." *See id*.

## II.     STANDARD FOR MOTION TO DISMISS

"A pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss for failure to state a claim upon which relief may be granted, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.  Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court's analysis is generally limited to the four corners of a complaint and the attached exhibits. *Grossman v. Nationsbank,* 225 F.3d 1228, 1231 (11th Cir. 2000).

A court must accept all factual allegations in the complaint as true and view the facts in a light most favorable to the plaintiff, but conclusions in a pleading "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The factual allegations must demonstrate that that the plaintiff is entitled to relief, not just show a "mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.  To survive dismissal, a plaintiff's factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  To determine "whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Plaintiff's obligation to provide the grounds for his entitlement to relief requires more

CASE NO. 0:25-cv-60143-AHS

than "labels and conclusions," and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Finally, although a plaintiff will generally be allowed to amend their complaint once as a matter of course, *see Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001), this leave to amend need not be granted if amendment would be futile and would not serve to cure the defective pleading. *Id.*

### III.    MEMORANDUM OF LAW AND LEGAL ARGUMENT

Plaintiff's Complaint must be dismissed as a matter of law for the following reasons: (1) Defendant is not a "debt collector" pursuant to 15 U.S.C. § 1692a(6); (2) the E-Mail is not a communication with Plaintiff that violates either the FCCPA or the FDCPA; (3) the pleading fails to state a valid cause of action under either the FCCPA or the FDCPA; (4) the E-Mail was purely informational in nature; (5) Plaintiff requested that the E-Mail to be sent to her; and (6) Plaintiff does not have standing, as she has not alleged any injury-in-fact.

### A.    **Defendant is Not a "Debt Collector" Pursuant to 15 U.S.C. §1692a(6).**

"A prima facie claim under the FDCPA requires the following: (1) the plaintiff was the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as that term is defined under the FDCPA, and (3) the defendant engaged in an activity that is prohibited by the FDCPA." *See Helman v. Udren Law Offices, P.C.*, 85 F.Supp.3d 1319, 1323 (S.D. Fla. 2014). Plaintiff alleges that Defendant violated the FDCPA as a "debt collector." The statute specifically states:

> The term "debt collector" … does not include-- (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; **(ii) concerns a debt which was originated by such person;** (iii) concerns a debt which was not in default at the time it was obtained by

3

CASE NO. 0:25-cv-60143-AHS

such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

*See* 15 U.S.C.A. § 1692a(6)(F) (emphasis added). Plaintiff alleges that Ginnie Mae was both the "original creditor" and that it is "current creditor." *See* ECF No. 1 at ¶¶ 7-8. However, Plaintiff's assertion is misleading and is in fact false, the underlying debt relates to a note (the "Note") and mortgage (the "Mortgage"), both of which clearly identify on their respective faces that the original lender was "Broker Solutions, Inc. dba New American Funding, a Corporation." True and correct copies of the Note and Mortgage are attached hereto as **Exhibits A and B**,[1] respectively. As such, it is clear from the face of the relevant loan documents that Defendant originated the loan in question and thus cannot be a debt collector as defined by the FDCPA. *See* 15 U.S.C.A. § 1692a(6)(F). Plaintiff's Complaint is due to be dismissed with prejudice as to the FDCPA claim, as an amendment would be futile.

**B.      The E-Mail is Not a Communication with Plaintiff that Violates the FDCPA or the FCCPA.**

Plaintiff alleges the E-Mail is a "communication" pursuant to the FDCPA and the FCCPA. *See* ECF No. 1 at ¶¶ 55, 67, 71.  However, Florida Courts have frequently held that "not all communications with a debtor are in violation of the FCCPA or FDCPA." *See Green v. Specialized Loan Servicing LLC*, 766 Fed. Appx. 777, 784 (11th Cir. 2019) ("We find nothing in the language in question from the Mortgage Statement, beyond what is required by TILA, which rises to the level of

---

1 "Our Rule 12(b)(6) decisions have adopted the 'incorporation by reference' doctrine, [citation omitted], under which a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Horsely v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *see also SFM Holdings, Ltd. v. Banc of America Securities, LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) ("In ruling on a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."). "The court may also consider judicially noticed documents." *See id*; *citing U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 (11th Cir. 2015).

CASE NO. 0:25-cv-60143-AHS

being unlawful debt collection language."); *Hurtubise v. P.N.C. Bank, N.A.*, No. 512013AP000015APAXWS, 2015 WL 3948192, at *4 (Fla. Cir. Ct. Jan. 5, 2015) (holding the trial court correctly concluded the communication was informational only and did not attempt to collect a debt); *Brown v. Select Portfolio Servicing, Inc.*, No. 16-62999-CIV, 2017 WL 1157253, at *4 (S.D. Fla. Mar. 24, 2017) (finding that routine account communications, such as transmitting a monthly statement, were not debt collection activity and were not attempts to collect a debt); *Shaffer v. Servis One, Inc.*, 347 F.Supp.3d 1039, 1046 (M.D. Fla. 2018) (same); *Wood v. Citibank, N.A.*, No. 8:14-CV-2819-T-27EAJ, 2015 WL 3561494, at *3 (M.D. Fla. June 5, 2015) (holding that for the FDCPA or FCCPA to apply, the communication "must have been made in connection with the collection of a debt"); *Nordwall v. PNC Mortg.*, No. 2:14-CV-747-FTM-CM, 2015 WL 4095350, at *4 (M.D. Fla. July 7, 2015) (finding that not all communications with a debtor are in violation of the FCCPA). In interpreting Florida Statute § 559.72(17), the court should "look first at the statute's plain meaning." *State v. J.M.*, 824 So. 2d 105, 109 (Fla. 2002). The court should give "every word, phrase, sentence, and part of the statute" weight and not view the statutory language as "mere surplusage." *Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 948 So. 2d 599, 606 (Fla. 2006). Also, legislative intent should be the "polestar" that guides the court's interpretation. *Borden v. E.-European Ins. Co.*, 921 So. 2d 587, 595 (Fla. 2006). When reviewed through this lens, the E-Mail is not a communication that qualifies as an attempt to collect a debt under either the FDCPA or the FCCPA.

For the FDCPA to apply, "two threshold criteria must be met. First, the defendant must qualify as a 'debt collector,' …. Second, the communication by the debt collector that forms the basis of the suit must have been made 'in connection with the collection of any debt.'" *See McElveen v. Westport Recovery Corp.*, 310 F.Supp.3d 1374, 1380 (S.D. Fla. 2018). "[C]ourts have developed a

CASE NO. 0:25-cv-60143-AHS

factor-based analysis that takes into account: '(1) the nature of the relationship of the parties; (2) whether the communication expressly demanded payment or stated a balance due; (3) whether it was sent in response to an inquiry or request by the debtor; (4) whether the statements were part of a strategy to make payment more likely; (5) whether the communication was from a debt collector; (6) whether it stated that it was an attempt to collect a debt; and (7) whether it threatened consequences should the debtor fail to pay.'" *See id; citing Bohringer v. Bayview Loan Servicing, LLC*, 141 F.Supp.3d 1229, 1240-41 (S.D. Fla. 2015). The E-Mail is not "in connection with the collection of any debt" as it does not "expressly demand payment or stated a balance due," it was not "from a debt collector" (as detailed in Section III.A., above); further, it was not an "attempt to collect a debt," and it does not threaten consequences should Plaintiff fail to pay. Thus, the FDCPA does not apply to the E-Mail.

The FCCPA is meant to "eliminate abusive and harassing tactics in the collection of debt." *See Bank of America, N.A. v. Siefker*, 201 So. 3d 811, 817-18 (Fla. 4th DCA 2016). In order for there to be a violation of the FCCPA, the communication must be in relation to the collection of a debt. *See* Fla. Stat. § 559.55(5). In support of her argument that a violation of the FCCPA was had, Plaintiff conveniently only *partially* cites Florida Statute § 559.72(17), which *in full* reads:

> In collecting consumer debts, no person shall: …
> (17) Communicate with the debtor between the hours of 9 p.m. and 8 a.m. in the debtor's time zone without the prior consent of the debtor.
> (a) The person may presume that the time a telephone call is received conforms to the local time zone assigned to the area code of the number called, unless the person reasonably believes that the debtor's telephone is located in a different time zone.
> (b) If, such as with toll-free numbers, an area code is not assigned to a specific geographic area, the person may presume that the time a telephone call is received conforms to the local time zone of the debtor's last known place of residence, unless the person reasonably believes that the debtor's telephone is located in a different time zone.

CASE NO. 0:25-cv-60143-AHS

*See id*.  In the Complaint, Plaintiff intentionally omitted subsections (a) and (b) from her citation. *See* ECF No. 1. at ¶ 70. Florida Statute § 559.72(17) clearly applies to telephone calls, not e-mails. Florida Statute § 559.72(17) was amended in 2010 to add subsection (a) and (b), well after the invention and widespread implementation of e-mail. *See* DEBTORS AND CREDITORS-- CONSUMER PROTECTION--COLLECTION AGENCIES, 2010 Fla. Sess. Law Serv. Ch. 2010- 127 (C.S.C.S.C.S.S.B. 2086). If the legislature had intended to prohibit e-mails, the language would have included e-mails as the legislators were clear to include references to "a telephone call," "debtor's telephone," and "toll-free numbers" as the prohibited actions when they amended the FCCPA. *See id*; *Warner v. Goldman Sachs Bank USA*, 2024 WL 4905183, at *5 (Fla. Co. Ct., Nov. 3, 2025).  The Court in *Warner* recently reviewed an e-mail communication that was a notification of an upcoming payment for a credit card and provided the debtor with information on how to make his payment online. *See id*. The Court "[found] that section 559.72(17) of the FCCPA does not apply to email communications." *See id*; *Nina Quinn-Davis v. TrueAccord Corp.*, 2024 WL 4851344 (S.D. Fla. Nov. 20, 2024) (noting that the FDCPA "was aimed at protecting consumers from after-hours noisy telephone rings--not e-mails sitting in one's e-mail box (silently).").

Based upon the full text of the specific complained-of provision, it is clear that the intent of the Legislature was to protect consumers from telephone calls, not the sending of an e-mail or the mailing of a letter.  *See* Fla. Stat. § 559.72(17).  Plaintiff's exclusion of subsections (a) and (b) appears to be intentional and appears to have been done intentionally to avoid the clarification of the Legislature's intent in creating this prohibition.  Florida Statute § 559.72(17) has been interpreted by the courts in a handful of instances, all of which involve phone calls, decidedly *not* e-mail communications.  *See, e.g., Garrett v. Credit Protection Ass'n, L.P.* 2017 WL 3193759 at *1 (M.D. Fla., July 27, 2017); *Target National Bank v. Welch*, 2016 WL 1157043 at *1 (M.D. Fla., March 24,

2016); *DeFrancesco v. Veripro Solutions, Inc.*, 2014 WL 4387570 at *1 (M.D. Fla., Sept. 5, 2014); *Brook v. Suncoast Schools, FCU*, 2012 WL 6059199 at *1 (M.D. Fla., Dec. 6, 2012).

Telephone calls are more likely to cause a disruption, and an invasion of privacy, as compared to the sending of an e-mail. *Lawrence v. FPA Villa Del Lago, LLC*, 584 F.Supp.3d 1105, 1115 (M.D. Fla. 2022). In *Lawrence*, the court found the five (5) e-mails sent by the landlord to the renter reminding the renter of past due rent were "pleasant (or neutral at worst) and simply remind Lawrence of the past due rent." *See id*. The court held that no reasonable juror could find those reminder communications included any harassing language. *See id*. The E-Mail at issue here is far less harmful to Plaintiff, as it does not even concern a past due amount, but rather, is an alert that Plaintiff's monthly statement is available online to view.

Even if Florida Statute § 559.72(17) applied to e-mail correspondence, which it does not, the language of the statute clearly states that its intent is to prohibit creditors from **communicating with** debtors between the hours of 9 p.m. and 8 a.m. *See* Fla. Stat. § 559.72(17) (emphasis added). Plaintiff merely alleges in conclusory fashion that the E-Mail was received by her at the exact moment it was "sent" by Defendant, 4:13 am, and that the E-Mail was "sent" between 9:00 PM and 8:00 AM, which is wholly insufficient to allege a violation of the FCCPA. *See* ECF No. 1 at ¶¶ 13-14, 53, 64-65. The E-Mail being received by Plaintiff's inbox is not analogous to Plaintiff logging into her e-mail account, and opening and reading the E-Mail, despite Plaintiff's efforts to frame same as identical under the FCCPA. *See Hunstein v. Preferred Collection and Mgmt. Servs., Inc.*, 48 F.4th 1236 (11th Cir. 2022) ("if inaccurate information falls into a consumer's credit file, … does it make a sound?") (quoting *TransUnion, LLC v. Ramirez*, 141 S.Ct. 2190, 2209 (2021)). No communication occurred with Plaintiff until she opened and read the E-Mail. The Florida Legislature was clear to use the terminology "communicate with" not "communicate at" or

CASE NO. 0:25-cv-60143-AHS

"communicate to" or something similar. *See* Fla. Stat. § 559.72(17). Other subsections of the FCCPA use the terminology "communicate to" or "communicate at" when the goal of the provision is a prohibition of the sending of a communication to the debtor. *See, e.g.,* Fla. Stat. § 559.72(16). When these subsections are read together as a whole, it is clear that the Legislature was intentional in conveying different meanings. *See M.W. v. Davis*, 756 So. 2d 90, 101 (Fla. 2000).

Finally, if it is assumed that Plaintiff's allegations that she "received" the E-Mail at exactly 4:13 a.m. is true, the only ways that Plaintiff would actually know this is if she opened her Yahoo inbox at exactly 4:13 a.m. to read her emails, or if her personal cellular device used her personalized, custom settings to notify her of the receipt of the E-Mail. *See*  ECF No. 1 at ¶ 14.  Thus, under this assumption, the E-Mail was not a disruption of Plaintiff's daily life before 8:00 a.m., as she was already awake and reviewing various e-mails received overnight, or alternatively, Plaintiff chose for her device to interrupt her "peaceful and relaxed state of mind," and thus, she consented to reading such e-mails at whatever time of day they were received.

The sending of the E-Mail at issue is not a violation of the FDCPA or the FCCPA, as the mere sending of same to her Yahoo account at 4:13 a.m. does not amount to a statutory violation by a plain reading the statutes, and thus, Plaintiff's claim should be dismissed with prejudice.

**C.**     **Plaintiff Fails to State a Cause of Action under the FDCPA and the FCCPA.**

Plaintiff's Complaint fails to state a valid cause of action under either the FDCPA or the FCCPA for multiple reasons. First and foremost, Plaintiff alleges that the "original creditor of the Subject Account is Ginnie Mae" and the "current creditor of the Subject Account is Ginnie Mae." *See* ECF No. 1 at ¶¶ 7-8. However, as detailed in Section III.A. above, the original loan documents signed by Plaintiff clearly identify the original lender of the underlying debt at issue as "Broker Solutions, Inc. d/b/a New American Funding, a Corporation." *See* Exs. A, B.  As noted, under the

FDCPA, an entity collecting debt that it originated is not a "debt collector" under the statute, and thus Plaintiff's FDCPA claims fail and require dismissal with prejudice.

Next, Plaintiff fails to specifically allege she was a resident of Florida at the time the E-Mail was sent. *See, generally* ECF No. 1. The FCCPA was enacted "as a means of regulating the activities of consumer collection agencies within the state" and its purpose "is to deter bad collection practices," and "to protect Florida consumers from illegal [and] unscrupulous practices of debt collectors and other persons." *See Gause v. Medical Business Consultants, Inc.*, 424 F.Supp.3d 1175, 1186 (M.D. Fla. 2019). The E-Mail was a reminder of an upcoming payment on her Mortgage, which was secured by a parcel of real property located in Michigan. *See* ECF No. 1-3. The FCCPA's purpose is to protect Florida consumers and Plaintiff has failed to allege she was a Florida consumer at the time the E-mail was sent. *See, generally* ECF No. 1. Therefore, Plaintiff's Complaint is due to be dismissed for failure to state a cause of action.

**D.      The E-Mail Was Purely Informational, and Thus, Does Not Violate Either the FDCPA or the FCCPA.**

"The FCCPA is the Florida analogue to the FDCPA, and generally the two Acts are construed in similar fashion whether the statutory language is the same." *See Daniels v. Select Portfolio Servicing, Inc.*, 34 F.4th 1260 n.2 (11th Cir. 2022) *citing Oppenheim v. I.C. Sys., Inc.*, 627 F.3d 833, 839 (11th Cir. 2010). The Legislature even included language in the FCCPA that "[i]n applying and construing this section, due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to the federal Fair Debt Collection Practices Act." *See* Fla. Stat. § 559.55(5). Both the FCCPA and the FDCPA define "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium." *See* 15 U.S.C. § 1692a(2); Fla. Stat. § 559.55(2). Thus, it would be reasonable to apply the factor-based analysis to the facts in this case. The factor-based analysis has

CASE NO. 0:25-cv-60143-AHS

been developed to determine whether a "communication" was made "in the connection with the collection of any debt" under the FDCPA, and includes the following:

> (1) the nature of the relationship of the parties; (2) whether the communication expressly demanded payment or stated a balance due; (3) whether it was sent in response to any inquiry or request by the debtor; (4) whether the statements were part of a strategy to make payment more likely; (5) whether the communication was from a debt collector; (6) whether it stated that it was an attempt to collect a debt; and (7) whether it threatened consequence should the debtor fail to pay."

*See McElveen v. Westport Recovery Corp.*, 310 F.Supp.3d 1374, 1380 (S.D. Fla. 2018) (quoting *Bohringer v. Bayview Loan Servicing, LLC*, 141 F.Supp.3d 1229, 1240-41 (S.D. Fla. 2015)).

Whether or not an e-mail is "in connection with the collection of any debt," or instead is merely "informational," is a "commonsense inquiry" that should consider the purpose and content of the communication. *See Helman v. Udren Law Offices, P.C.*, 85 F.Supp.3d 1319, 1325 (S.D. Fla. 2014) (dismissing FDCPA claim). Again, the E-Mail does not meet the criteria to be "in connection with the collection of a debt" as: (1) it does not demand payment or state a balance due; (2) it was requested to be sent by Plaintiff; (3) the relationship of the parties does not suggest that the E-Mail is an attempt to collect a disputed debt, or that it was part of a strategy to make payment more likely; (4) it does not state it is an attempt to collect a debt; and (5) it did not threaten consequence should the Plaintiff fail to pay. Therefore, as the E-Mail does not relate to debt collection, it was merely sent as a reminder and for informational purposes, and thus, does not equate to a violation of the FDCPA 15 U.S.C. § 1692c(a) or the FCCPA under § 559.72(17). *See McElveen*, 310 F.Supp.3d at 1380 (letters sent for informational purposes do not fall within the ambit of the FDCPA); *Daley v. Bono*, 420 F.Supp.3d 1247, 1258-59 (M.D. Fla. 2019) (finding the communications at issue to be "informational"); *Bohringer*, 141 F.Supp.3d at 1242 ("[s]tatements of account are not debt collection activity; rather, they are normal incidents of loan servicing"); *Bailey v. Sec. Nat. Servicing Corp.*, 154 F.3d 384, 388 (7th Cir. 1998) (communications which merely communicate the status of an

CASE NO. 0:25-cv-60143-AHS

account are not an attempt to collect a debt); *Alhassid v. Nationstar Mortgage, LLC,* 771 Fed. Appx. 965, 968-69 (11th Cir. 2019) (affirming dismissal of FDCPA and FCCPA claims because communication *was "purely informational"); Wood v. Citibank, N.A.*, No. 8:14-CV-2819-T-27EAJ, 2015 WL 3561494, at *4 (M.D. Fla. June 5, 2015) (holding letters sent to debtors were "purely informational," do not constitute debt collection activity, and are not subject to FDCPA or FCCPA; *Nordwall*, 2015 WL 4095350, at *4 (holding that the communications sent to the debtor were "purely informational, and do not fall within the confines of the FCCPA or FDCPA"); *Gillespie v. Chase Home Finances, LLC*, No. 3:09-CV-191-TS, 2009 WL 4061428, at *6 (N.D. Ind., Nov. 20, 2009) (holding that the correspondence sent to the represented debtor was informational and not subject to the FDCPA when the letters did not provide the terms of payment, deadline, threaten future collection proceedings, or demand payments). Lastly, the E-Mail cannot be considered to be one that was "collecting consumer debt," as the Plaintiff's payment was not past due or even due at the time the E-Mail was sent.

Finally, the E-Mail itself contains the language "***[t]his message is for information purposes only.*** Please do not respond to this email address." *See* ECF No. 1-3 (emphasis added). As the E-Mail was purely informational in nature and did not constitute a communication attempting to collect a debt, the mere sending of same cannot be deemed to be a violation of the FDCPA or the FCCPA, and as such, Plaintiff's claim must be dismissed.

**E.    Plaintiff Requested and Consented to the Sending of the E-Mail.**

The E-Mail cannot be a violation of the FDCPA or the FCCPA as the Plaintiff requested said correspondence to be sent to her monthly. The FDCPA provides that *"**[w]ithout the prior consent of the consumer given directly to the debt collector** or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the*

CASE NO. 0:25-cv-60143-AHS

collection of any debt …." *See* 15 U.S.C. §1692c(a) (emphasis added).    Florida Statute §

559.72(17) provides that "[i]n collecting consumer debts, no person shall: … (17) Communicate

with the debtor between the hours of 9 p.m. and 8 a.m. in the debtor's time zone ***without the prior***

***consent of the debtor*** ." *See* Fla. Stat. § 559.72(17) (emphasis added). In the instant matter, Plaintiff

herself executed a "Technology Consent Agreement" at the closing of the underlying loan on

October 21, 2019, wherein she authorized the Defendant to communicate with her regarding her loan

via "mail, telephone, or email." A copy of the Technology Consent Agreement signed by Plaintiff is

attached hereto as **Exhibit C**.[2] As Plaintiff voluntarily selected to receive this E-Mail (among other

communications from NAF), Plaintiff cannot now allege in good faith that the E-Mail is a violation

of her expectations of privacy, or of the FDCPA or the FCCPA for that matter. Thus, Plaintiff's

Complaint is due to be dismissed, as Plaintiff consented to and specifically requested that Defendant

send her monthly mortgage statements (and other communications) specifically by e-mail, and to the

e-mail address at issue.

**F.**   **Plaintiff Does Not Have Standing as She Has Not Alleged any Injury-in-Fact.**

Plaintiff does not have standing to bring her claims in this Court under the FDCPA or the

FCCPA, as she has not alleged any injury-in-fact that was caused by the E-Mail.  In order to

establish standing, Plaintiff "must demonstrate an 'injury in fact,' which is 'concrete,' 'distinct and

palpable,' and 'actual or imminent.' …." *See State v. J.P.*, 907 So. 2d 1101, 1113 n.4 (Fla. 2004).  A

statutory violation alone will not satisfy the injury inquiry.  *See Pet Supermarket, Inc. v. Eldridge*,

360 So. 3d 1201, 1206 (Fla. 3d DCA 2023); *Olen Props. Corp. v. Moss*, 981 So. 2d 515, 517 (Fla.

4th DCA 2008).  In *Eldridge*, the Court found that one single text message received by the plaintiff

"while at home, during the weekend, simply does not rise to the level of outrageousness required for

---

[2] As outlined in FN 1 above, this Court can consider documents incorporated into the instant Motion.

CASE NO. 0:25-cv-60143-AHS

an invasion of privacy, i.e., that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,' and therefore, [his] alleged statutory injury is not akin to Florida's common law form of intrusion upon seclusion" and held the plaintiff did not sufficiently allege a concrete injury. *See Eldridge*, 360 So. 3d at 1207.

Here, Plaintiff merely alleges that she lost an hour of sleep one night due to her receipt of the E-Mail, which is insufficient to be a concrete injury.  Plaintiff alleges that prior to the E-Mail being sent, she was "resting, undisrupted, and otherwise in a peaceful and relaxed state of mind." *See* ECF No. 1 at ¶ 15. Further, Plaintiff alleges that the E-mail "caused Plaintiff's cellular telephone to emit an audible sound at 4:13 AM and, in so doing, intruded into the peace and quiet realm of Plaintiff that is private and personal." *See id* at ¶ 16. Lastly, Plaintiff alleges that after reading the E-Mail "and learning the subject matter thereof, Plaintiff became upset and frustrated, as Defendant was attempting to collect a debt from Plaintiff at 4:13 AM without Plaintiff's direct consent or permission" and "Plaintiff wasted approximately five (5) minutes of time retrieving the Plaintiff's cellular telephone and reviewing the [E-mail]… became restless and unable to return to the prior state of peace and relaxation … lost approximately one (1) hour of sleep on April 2, 2024." *See id* at ¶¶ 21-24. Plaintiff's sleep being interrupted by her own cellular telephone, working pursuant to her own custom and personalized settings is insufficient to establish a concrete injury, as Plaintiff herself chose to allow her cellular phone to emit an audible alert at 4:13 AM when the E-mail was received (and presumably, when *any* email was received). *See Warner v. Goldman Sachs Bank USA*, 2024 WL 4905183, at *4 (Fla. Co. Ct., Nov. 3, 2024) (finding that "Plaintiff's contention that he received an audible notification when he received the Subject Email only serves to confirm that his phone settings, which he selected, not GS Bank, were the cause of the annoyance and aggravation. Thus, Plaintiff himself (or whoever modified his mobile device settings to receive visual and audible

CASE NO. 0:25-cv-60143-AHS

notifications), and not GS Bank, is the source of this purported 'annoyance and aggravation' that he suffered when he received the Subject Email."). In the instant case, Plaintiff herself chose to not to silence notifications while she slept, and she herself chose to receive notifications for e-mails received while she was sleeping. Defendant had no involvement in those decisions. As Plaintiff does not have standing to bring her claims, and she has failed to plead a concrete injury, her Complaint should be dismissed.

## IV.  CONCLUSION

Plaintiff has failed to plead a valid claim for any violation of the FDCPA or the FCCPA as a result of her receipt of the E-Mail complained of in the Complaint, and dismissal is warranted given the multitude of arguments outlined herein.

Defendant is not liable under the FDCPA as it originated the debt associated with this communication. The E-Mail was sent to Plaintiff at her designated email address, specifically as a result of her agreement, consent, and directive to send all communications related to her loan account to such email address – a consent that was executed at the time the loan was originated, and which has never been revoked. Further, the E-Mail was not a communication in an effort to collect a debt but was merely an informational message alerting Plaintiff that her monthly mortgage account statement was now available for viewing. Finally, Plaintiff has failed to establish or even plead that she has suffered any concrete injury or injury-in-fact sufficient to establish her standing to bring the claims she has asserted in her Complaint. For these reasons, and those others outlined above, Plaintiff's Complaint should be dismissed. And because amendment cannot cure the factual deficiencies present in Plaintiff's Complaint, dismissal should be with prejudice.

*WHEREFORE*, Defendant, New American Funding, LLC, respectfully requests that this Honorable Court enter an order granting its Motion to Dismiss, dismissing the Plaintiff's Class

CASE NO. 0:25-cv-60143-AHS

Action Complaint in this action, and that such dismissal be with prejudice, that Defendant shall be awarded its attorneys' fees and costs for having to defend against this action, and for any and all other relief this Court deems just and proper.

Submitted March 11, 2025.

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
200 East Broward Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
Telephone: (954) 768-1600
Facsimile: (954) 333-3930
*Counsel for Defendant, New American Funding, LLC*

By:  */s/ Matthew R. Feluren*
    Eve A. Cann
    Florida Bar No.: 0040808
    ecann@bakerdonelson.com
    Matthew R. Feluren
    Florida Bar No.: 85879
    mfeluren@bakerdonelson.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2025, I served a copy of the foregoing electronically via CM/ECF to all parties/attorneys on the list to receive notice in this case, including but not limited to the following:

Thomas Patti, Esq.
Victor Zabaleta, Esq.
**Patti Zabaleta Law Group**
110 SE 6th Street, Suite 1732
Fort Lauderdale, FL 33301
Telephone: (561) 542-8550
Tom@pzlg.legal
Victor@pzlg.legal
*Counsel for Plaintiff*

*/s/ Matthew R. Feluren*
    Matthew R. Feluren

16

LOAN #: ▮▮▮2986
MIN: ▮▮▮▮105-2

**NOTE**

FHA Case No.
▮▮▮203B

October 21, 2019                                    Tustin,                                    California
[Date]                                             [City]                                     [State]

26082 Clear St, Harrison Township, MI 48045
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
     In return for a loan that I have received, I promise to pay U.S. **$145,220.00**     (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is  **Broker Solutions, Inc.dba New American Funding, a
Corporation.**

I will make all payments under this Note in the form of cash, check or money order.
     I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
     Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a
yearly rate of  **3.750 %.**
     The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section
6(B) of this Note.

**3.   PAYMENTS**
     **(A)  Time and Place of Payments**
     I will pay principal and interest by making a payment every month.
     I will make my monthly payment on the  **1st**     day of each month beginning on **December 1, 2019.**
I will make these payments every month until I have paid all of the principal and interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will
be applied to interest and any other items in the order described in the Security Instrument before Principal. If, on
**November 1, 2049,**     I still owe amounts under this Note, I will pay those amounts in full on that date, which is
called the "Maturity Date."
     I will make my monthly payments at  **P.O.Box 650076**
                                       **Dallas, TX 75265-0076**
or at a different place if required by the Note Holder.
     **(B)  Amount of Monthly Payments**
     My monthly payment will be in the amount of U.S. **$672.54.**

**4.   BORROWER'S RIGHT TO PREPAY**
     I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known
as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate
a payment as a Prepayment if I have not made all the monthly payments due under the Note.
     I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use
my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of
my monthly payment unless the Note Holder agrees in writing to those changes.

**5.   LOAN CHARGES**
     If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or
other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such
loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already
collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund
by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the
reduction will be treated as a partial Prepayment.

**6.   BORROWER'S FAILURE TO PAY AS REQUIRED**
     **(A)  Late Charge for Overdue Payments**
     If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after
the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000 %** of my overdue
payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

     **(B)  Default**
     If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
     **(C)  Notice of Default**
     If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a
certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3200 1/01
Modified for FHA 9/15 (rev. 2/16)                                                          Initials: ___
Ellie Mae, Inc.                                                                            FHA3200NOT   0216
                                    Page 1 of 2                                            FHA3200NOT (CLS)

**Exhibit A**

LOAN #: ████2986

all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
LAUREN O'CONNOR

Lender: Broker Solutions, Inc.dba New American Funding
NMLS ID: 6606
Broker:
NMLS ID: 6606
Loan Originator: Frederick Walker
NMLS ID: 1510632

[Sign Original Only]

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
Modified for FHA 9/15 (rev. 2/16)
Ellie Mae, Inc.                                                        Page 2 of 2
Initials: _____
FHA3200NOT   0216
FHA3200NOT (CLS)

LIBER 26304  PAGE 414
11/01/2019  05:13:03 PM
Macomb County, MI
Fred Miller, Clerk/Register of Deeds          SEAL
Receipt # 75332

# MORTGAGE

When recorded, return to:
First American Mortgage Solutions
c/o New American Funding Post Closing
1795 International Way
Idaho Falls , ID 83402

This document was prepared by: Jan Smith.
Broker Solutions, Inc.dba New American Funding
14511 Myford Road, Suite 100
Tustin, CA 92780

Title Order No.: 19-17568-19
Escrow No.: 19-17568-19
LOAN #: ███████2986

———————————————[Space Above This Line For Recording Data]———————————————

| FHA Case No. |
|---|
| ████████203B |

MIN: ██████████105-2
MERS PHONE #: █████████6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 15.
**(A) "Security Instrument"** means this document, which is dated  **October 21, 2019,**          together with all Riders to this document.
**(B) "Borrower"** is   **LAUREN O'CONNOR, SINGLE WOMAN.**

Borrower's address is  **27850 Coleridge
                        Harrison Township, MI 48045.**

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is   **Broker Solutions, Inc.dba New American Funding.**

Lender is  **a Corporation,**                                                    organized and existing
under the laws of  **California.**
Lender's address is  **14511 Myford Road, Suite 100, Tustin, CA 92780.**

**(E) "Note"** means the promissory note signed by Borrower and dated  **October 21, 2019.**     The Note states that Borrower owes Lender   **ONE HUNDRED FORTY FIVE THOUSAND TWO HUNDRED TWENTY AND NO/100 * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * Dollars (U.S. $145,220.00           )**

MICHIGAN—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3023 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                          Page 1 of 8

Initials: _____
MIEFHA15DE  0915
MIEDEED (CLS)



19-17568-19
CISCO TITLE CO.
30



LOAN #: ▮▮▮2986

plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **November 1, 2049.**

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Planned Unit Development Rider
☐ Other(s) [specify]


**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(Q) "Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his designee.
**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the **County** of **Macomb**
　　　　　[Type of Recording Jurisdiction]　　　　　[Name of Recording Jurisdiction]:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
**APN #: 17-11-36-229-010**


which currently has the address of **26082 Clear St, Harrison Township,**

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　[Street] [City]

Michigan **48045**　　　　　　　　　("Property Address"):
　　　　[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.

MICHIGAN–Single Family–Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**　Form 3023 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.　　　　　　　　　　　　　　　Page 2 of 8

Initials: _____

MIEFHA15DE  0915
MIEDEED (CLS)



LOAN #: ██████2986

Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

MICHIGAN–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3023 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                    Page 3 of 8

Initials: 

MIEFHA15DE  0915
MIEDEED (CLS)

LOAN #: ████2986

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 23 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

MICHIGAN–Single Family–Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**    Form 3023 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                Page 4 of 8

Initials: 
MIEFHA15DE  0915
MIEDEED (CLS)

**LOAN #:** ▮▮▮2986

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in

MICHIGAN–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3023 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                                                 Page 5 of 8

Initials: _____

MIEFHA15DE  0915
MIEDEED (CLS)

LOAN #: ████2986

Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Note holder agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceedings; (ii) reinstatement will

MICHIGAN–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3023 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                    Page 6 of 8

Initials: 

MIEFHA15DE  0915
MIEDEED (CLS)

**LOAN #:** ██████2986

preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**22. Grounds for Acceleration of Debt.**

**(a) Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

    (i)  Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

    (ii)  Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

**(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn–St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

    (i)  All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

    (ii)  The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

**(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

**(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

**(e) Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**23. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17

MICHIGAN—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3023 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.    Page 7 of 8    Initials: _____

MIEFHA15DE  0915
MIEDEED (CLS)

LOAN #: ████2986

unless Applicable Law provides otherwise. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 23, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 14. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Section 22, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Section 23 or applicable law.

24. Release. Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____   10/21/19   (Seal)
LAUREN O'CONNOR                                         DATE

State of MI
County of MACOMB

The foregoing instrument was acknowledged before me, Rita Paciocco, (Notary Public), this October 21, 2019 (date) by LAUREN O'CONNOR, (name of person acknowledged). A Single Woman

State of _____, County of MACOMB

My Commission Expires: _____

Acting in the County of: _____

RITA PACIOCCO
Notary Public - State of Michigan
County of Macomb
My Commission Expires Feb 12, 2025
Acting in the County of _____

Lender: Broker Solutions, Inc.dba New American Funding
NMLS ID: 6606
Broker:
NMLS ID: 6606
Loan Originator: Frederick Walker
NMLS ID: 1510632

MICHIGAN–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3023 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
Ellie Mae, Inc.                                    Page 8 of 8

Initials: LO

MIEFHA15DE  0915
MIEDEED (CLS)



**EXHIBIT A**
File: 19-17568-19

The land referred to in this exhibit, Land situated in the Township of Harrison, Macomb County, State of Michigan, to-wit:

Lot 98, Lake St. Clair Land Co's Subdivision, according to the recorded plat thereof as recorded in Liber 3 on Page 65 of Plats, Macomb County Records.

More commonly known as: 26082 Clear Street, Harrison charter Township, MI 48045

Tax Parcel No.: 17-11-36-229-010

October 21, 2019

## NAF Technology Consent Agreement

**Borrower Name(s):**   Lauren O'connor

**Address:**   26082 Clear St
Harrison Township, MI 48045

**Borrower Cell:**
**Borrower Home:** ████████
**Borrower Work:** ████████

New American Funding will use technology to provide you with important communications and updates. New American Funding prides itself on keeping you updated about your loan transaction. This is a big part of why we garner such high satisfaction on our customer reviews. To facilitate these high ratings, we rely on technology to communicate progress which aids in our ability to extend exceptional service. Please help us succeed by reviewing the important information below.

***Consent to Use of Technology to Reach You and Update You.***

For purposes of this NAF Technology Consent Agreement, "you" or "your" means the person(s) making a loan inquiry and/or a loan application with Broker Solutions, Inc. dba New American Funding. For the purposes of this Agreement, "New American Funding", "NAF", "us" or "we" means Broker Solutions, Inc. dba New American Funding.

**Automated Dialing, Text Messages and Email Consent.**   I authorize New American Funding to contact me at any phone number I provide using an automated dialing system and to send me text message updates even if the telephone number I provided is a cellular phone or other service for which the party is charged. I understand that I am not required to provide this consent in order to obtain goods or services from NAF. I agree that NAF may contact me by mail, telephone or email in connection with my request even if my telephone number or email address appears on a NAF internal Do Not Call / Do Not Email List, a State or National Do Not Call Registry, a Do Not E-Mail list, or any other Do Not Contact List.

By placing my electronic signature below to this document, I hereby agree that NAF can use the above described technology systems to communicate with me.

NAF Technology Agreement      (Rev. 02.10.2019)

# Exhibit C

Please print and retain a copy for your records.

Lauren O'connor

NAF Technology Agreement



(Rev. 02.10.2019)